IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

LILLIE M.[1] O/B/O )
X.T., a minor child, )
                 )    Civil Action No. 7:22-CV-00676
      Plaintiff, )
                 )
v. )    <u>REPORT AND RECOMMENDATION</u>
                 )
MARTIN O'MALLEY[2], )
Commissioner of Social Security, )    By: C. Kailani Memmer
                 )    United States Magistrate Judge
      Defendant. )

       Plaintiff Lillie M. ("Lillie") on behalf of X.T., a minor child, filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding X.T. not disabled and therefore ineligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). ECF No. 26. As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

       For the reasons detailed below, I recommend the presiding District Judge **DENY** Lillie's Motion for Summary Judgment, ECF No. 17, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 24, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Lillie, on behalf of X.T., failed to demonstrate that X.T. was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the Administrative Law Judge's ("ALJ") analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

---

[3] Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i)

## CLAIM HISTORY

X.T. was born in August 2006 with a congenital right foot deformity, no right tibia, and an unstable right knee. R. 13, 208. X.T.'s mother applied for SSI on his behalf in March 2008, and in August 2008, when X.T. was approximately two years old, the Commissioner found X.T. disabled. R. 68.

A child is disabled under the Social Security Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Under the regulations, the determination of whether a child meets this definition requires a three-step inquiry. 20 C.F.R. § 416.924. The first step is to determine whether the child is working and performing substantial gainful activity. *Id*. § 416.924(b). If the child is not working, it must then be determined whether the child suffers from a severe impairment or combination of impairments. *Id*. § 416.924(c). If the child suffers from a severe impairment or combination of impairments, it must then be determined whether the child's impairment(s) meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. § 416.924(d).

To determine whether an impairment is functionally equivalent to a listed impairment, the ALJ evaluates its severity in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Id*. § 416.926a(b)(1). Functional equivalence exists if the ALJ finds a "marked" limitation in two areas of functioning or an "extreme" limitation in one area of functioning. *Id*. § 416.926a(d). A "marked" limitation is one that "interferes seriously with [the claimant's] ability to independently initiate, sustain, or

3

complete activities." *Id*. § 416.924a(e)(2)(i). A "marked" limitation "also means a limitation that is 'more than moderate' but 'less than extreme.'" *Id*.

After the Commissioner awards SSI benefits to an individual under the age of 18 based upon "an impairment (or combination of impairments) which is likely to improve," the Commissioner must periodically conduct an evaluation to determine if the individual remains eligible for benefits. 42 U.S.C. § 1382c(a)(3)(H)(ii)(I). When X.T. was 8 years old, the Commissioner performed a required continuing disability review, and on December 3, 2014, the ALJ concluded that X.T. was no longer disabled because he was able to use a prosthesis without great difficulty. R. 61–98. Lillie, on behalf of X.T., appealed the Commissioner's decision which was affirmed by the District Court on March 26, 2019. R. 106.

On January 19, 2019, Lillie filed a new claim for child's SSI benefits on behalf of X.T. with an alleged onset date of August 22, 2006. R. 194–98. The claim was denied at the initial and reconsideration levels of review. R. 114, 122, 133–36, 141–42. On December 9, 2021, ALJ Joseph Scruton held a hearing to consider X.T.'s disability claim. R. 28–60. At the hearing, Lillie amended X.T.'s alleged onset date of disability to January 19, 2019, the same date as the application. R. 33–34. Counsel represented X.T. at the hearing, which included testimony from X.T. and Lillie, who is X.T.'s grandmother. R. 28–60.

On February 8, 2022, the ALJ issued his decision finding that X.T. did not meet, medically equal, or functionally equal a listed impairment. R. 9–27. The ALJ determined that X.T. was not engaged in substantial gainful activity and suffered from the severe impairments of right leg amputation outfitted with prosthesis, attention-deficit/hyperactivity disorder ("ADHD"), and thoracic spine scoliosis. R. 13. The ALJ concluded at step three that X.T.'s severe impairments or

combination of impairments did not meet or medically equal the severity of one of the listed impairments. R. 14; *see* 20 C.F.R. § 416.924.

The ALJ considered the six functional domains and concluded that X.T. had "less than marked limitation" in all domains, other than "no limitation" in the ability to care for himself. R. 15–22. Thus, the ALJ concluded that X.T. was not disabled. R. 22. Lillie appealed the ALJ's decision, and on October 6, 2022, the Appeals Council denied her request for review. R. 1–6. This appeal followed.

## FACTS

### A.  Medical Records

X.T. was born with a congenital foot deformity in 2006 and underwent amputation of his right leg through the knee in 2007. R. 366, 415–16. X.T. received a prosthetic which he continues to use. R. 416. In 2016, X.T. had additional corrective surgery on his right leg. R. 366, 476.

On July 11, 2017, X.T. saw Jonathan Fraim, PA, for evaluation of eczema manifested by pruritic rash on his trunk and extremities that had existed for years and flared up over the past several months. R. 354–55. Upon examination, Dr. Fraim noted X.T. had erythematous, slightly scaly macules and papules scattered on his extremities and trunk. R. 355. There were no signs of infection. *Id*. Dr. Fraim assessed X.T. with atopic dermatitis, unspecified type, and prescribed a steroid ointment to manage the flare up. *Id*.

On February 26, 2019, X.T. saw Laura Dziadzio, MD, for a follow up regarding allergic rhinitis and atopic dermatitis. R. 512–16. The record from this visit reflects X.T.'s history and clinical findings to include allergy to mold, chronic seasonal allergic rhinitis due to pollen, allergic rhinoconjunctivitis of both eyes, and other atopic dermatitis. R. 515–16. Dr. Dziadzio

recommended topical creams and nasal spray for his ailments, with a recommended follow-up appointment in four months. *Id*.

On March 7, 2019, X.T. saw Brenna Keane, D.O., at Carilion Clinic presenting with complaints of left knee pain that had persisted for several months. R. 405. During this appointment, X.T.'s grandmother noted concerns regarding depression, stating X.T. admitted to being bullied. *Id*. Upon examination of X.T.'s left knee, he had tenderness over the tibial tuberosity, but range of motion was not limited and there were no focal neurological deficits. R. 407. Dr. Keane diagnosed X.T. with Osgood-Schlatter's disease on the left and mood disorder, and X.T. was prescribed Naproxen and Zoloft, referred for x-rays of the left knee, and advised to return for a follow-up appointment in one month. *Id*. On March 8, 2019, X.T. underwent an x-ray of his left knee which showed fragmentation and distraction at the tibial tuberosity with anterior soft tissue swelling. R. 517–18. The x-ray results were noted to be consistent with clinical suspicion for Osgood-Schlatter's disease. *Id*.

On April 22, 2019, X.T. saw Dr. Keane for a follow-up appointment regarding his knee pain and depression. R. 399. X.T. reported his knee pain improved since his previous visit. *Id*. Lillie reported she did not notice much change in X.T.'s mood since starting Zoloft. *Id*. She also requested a refill of X.T.'s ADHD medication. *Id*. X.T.'s examination findings were unremarkable, and Dr. Keane noted diagnoses of depression and ADHD, renewed his prescription for Adderall and increased his daily dosage of Zoloft from 25mg to 50mg. R. 401–02.

On June 10, 2019, X.T. saw Jonathon Bryant, O.D., at Shriners Hospitals for Children, to receive a new prosthesis due to breaking his most recent one. R. 366–67. His examination was notable for slight irritation of the skin over one small area of the stump, but there was no tenderness to palpation over the patella. R. 366. X.T. demonstrated a reciprocal heel-toe gait with the

prosthesis in place. *Id*. Dr. Bryant indicated X.T. was doing "really well," and he wrote a prescription for a new prosthesis and indicated that X.T. should follow up in one year to check the alignment of the right lower extremity. R. 367.

On June 12, 2019, X.T. was seen at Virginia Prosthetics and Orthotics for an initial evaluation and measurements to provide a right transfemoral prosthesis with a Total Knee, and J Balance foot. R. 413. At this appointment, it was reported that X.T. was highly active. R. 416.

On July 19, 2019, X.T. saw Kelly Henchel, M.D., for a well child visit. R. 390–93. X.T. indicated he was "doing better" in regard to his self-image. R. 393. Dr. Henchel continued X.T. on Adderall and Zoloft and advised him to return for a follow-up appointment in three months. R. 394–96.

On July 24, 2019, X.T. saw Philip Wakefield, MD, to follow up on his eczema, and Lillie reported his symptoms were improving with the use of Mometasone. R. 496–97. Dr. Wakefield noted X.T.'s dermatitis was "still very active" on the arms with numerous papules and excoriated papules. R. 498. Dr. Wakefield adjusted X.T.'s medications and urged a follow-up appointment in four months, but X.T.'s family requested a follow-up in six months or sooner for changing symptoms. *Id*.

X.T. received his new prosthesis in August 2019. R. 422. At a follow-up on September 11, 2019, X.T. reported that his prosthesis was a little heavier than his previous one because he had switched to an adult version, but he reported that he wore the device to school every day without complications. R. 426. At a follow-up appointment on October 7, 2019, it was noted X.T. was "doing very well" with respect to the fit and function of his prosthesis. R. 429.

On October 11, 2019, X.T. saw Dr. Henchel to follow up on his ADHD. R. 384–85. X.T. reported he was doing well, but Lillie noted he was "moody" on some mornings. *Id*. X.T. was continued on his current medication and advised to follow up in six months. R. 387.

On November 29, 2019, X.T. saw Amy Barker, N.P., at Carilion Clinic to follow up on allergic rhinitis and eczema. R. 486–87. Lillie reported X.T.'s conditions were well-controlled when X.T. is compliant with his medication/cream regimens. *Id*. Ms. Barker continued X.T. on his medications and advised to follow up in six months. R. 487. On January 14, 2020, X.T. saw Dr. Simpson for a dermatology appointment. R. 484–86. Dr. Simpson encouraged X.T. to comply with the recommended medication/cream regimens and advised him to follow up in six months. *Id*.

On February 3, 2020, X.T. was seen at Virginia Prosthetics and Orthotics and related no complaints regarding his prosthetic. R. 528. On June 5, 2020, X.T. had a follow up appointment for adjustment of his prosthesis to accommodate a growth spurt. R. 431–32.

On July 15, 2020, X.T. saw Dr. Johnson for a follow-up appointment regarding his atopic dermatitis. R. 478–79. Upon examination, it was noted X.T. had a few areas of linear excoriations and a few slightly lichenified excoriated papules on the arms, and Dr. Johnson, who also diagnosed post-inflammatory hyperpigmentation, indicated that atopic dermatitis was "still not under good control." R. 479.

On October 5, 2020, X.T. saw Dr. Keane for a well child visit. R. 611. Upon examination, it was noted X.T. had right thoracic rib hump. R. 616. During the appointment, X.T. reported he was struggling in school, especially in math. R. 615. As for his ADHD, Dr. Keane prescribed 1mg of Intuniv to be taken every morning. R. 617. As for scoliosis, Dr. Keane held off on x-rays because X.T. did not have back pain or limitation. *Id*. On December 16, 2020, at a follow-up appointment via telemedicine, Lillie reported despite the recent prescription of Intuniv, X.T. was still having

difficulty completing tasks and was taking all day to finish his schoolwork. R. 593. Dr. Keane

continued Intuniv and added Concerta to X.T.'s medication regimen for his ADHD. R. 595. On

January 13, 2021, at a follow-up appointment via telemedicine, Lillie reported X.T. had improved

focus with the addition of Concerta, but noted he experienced decreased appetite as a side effect

of the medication. R. 587.

On June 14, 2021, X.T. had an appointment at Virginia Prosthetic and Orthotics to have

his prosthesis lengthened by approximately 3/8 inch. R. 543–44. The fit and function of the

prosthesis was appropriate at a follow-up visit on June 30, 2021. R. 573.

On June 30, 2021, X.T. saw Dr. Keane for an acute visit. R. 577. Lillie reported concerns

regarding X.T.'s decreased appetite. *Id*. Dr. Keane reassured Lillie that X.T.'s decreased appetite

was likely due to a number of factors and was not a cause for significant concern. R. 577–78.

**B. School Records**

During the 2019-2020 school year, X.T. earned an "A" in Health/Physical Education, a

"D" in Civics and Economics, and a "P" (passing grade) his other subjects, including Science,

English, Pre-Algebra, and Choir. R. 255. During this school year, X.T. received the following

accommodations:

> 1. Safety and free movement opportunities will be provided for [X.T.] in physical
> education class. 2. Consistent communication between the classroom teachers and
> [X.T.'s] guardian will be maintained to ensure issues concerning his mobility are
> addressed. 3. [X.T.] will have small group testing in math, English, science, and
> civics. Small group for SOL's. 4. [X.T.] will be allowed 2 extra minutes in the
> hallway for transitions. 5. Extended time that equates to time and one half the
> allotted time given to all students when completing class work, quizzes, and tests
> in English, math, science, civics, and electives.
> For Physical Education class allow student to take breaks or limit participation
> when student['s] leg is hurting.

R. 290. The Individual Accommodation Plan ("IAP") provides that X.T. had Section 504

disabilities of a prosthetic limb and ADHD and that his major life activities affected by his

disabilities included bending, walking, and concentrating. *Id*. The IAP further provides that X.T. did not have an Individualized Education Plan ("IEP") at that time. *Id*. During this school year, X.T. received at least four disciplinary alerts, which included failing to get off his Chromebook to complete classwork. R. 260.

During the 2020-2021 school year, X.T. earned a "B" in Electricity 1, a "C" in Earth Science, a "C" in Health/Physical Education, a "D" in English, and "F's" in World History, Algebra, and Cantus Choir. R. 316. During this school year, X.T. received similar accommodations as the 2019-2020 school year, but increased his time to 10 extra minutes in the hallway for transitions. R. 319. His IAP reflected the same disabilities that effected his major life activities of bending, walking, and concentrating. *Id*. In January 2021, X.T. received a disciplinary alert for seven absences in his choir course. R. 318. In March 2021, X.T. was noted for excellence for "not giving up and making major improvement with his current classes." *Id*. He was also thanked for working so hard during the nine-week period and utilizing Saturday tutoring to catch up on his schoolwork. *Id*.

During the 2021-2022 school year, his mid-year grades reflected that X.T. had a "B" in Electricity 2, a "C" in Biology 1, and a "D" in Algebra 1. R. 317.

### C. Teacher Questionnaires

In February 2020, X.T.'s eighth grade teachers in English, Health/Physical Education, and Pre-Algebra completed Teacher Questionnaires. R. 291–307, 308–15.

Michelle Pruitt, X.T.'s eighth grade English teacher at Benjamin Franklin Middle School, reported that she knew X.T. for seven months and saw him Monday through Friday for English when she filled out the teacher questionnaire. R. 291. Ms. Pruitt indicated that X.T. was performing below average in both reading and written language. R. 291. Ms. Pruitt noted that X.T. had no

limitations in moving about and manipulating objects, but had problems acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. R. 291–98. Ms. Pruitt noted that she did not know if X.T. was prescribed medication. R. 297.

As for problems acquiring and using information, Ms. Pruitt indicated that X.T. has (1) a slight problem understanding school and content vocabulary, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, and applying problem-solving skills in class discussions; (2) an obvious problem comprehending oral instructions, reading and comprehending written material, learning new material, and recalling and applying previously learned material; and (3) a very serious problem expressing ideas in written form. R. 292. Ms. Pruitt noted that "[X.T.'s] biggest weakness is in writing; however, he does also struggle with reading comprehension. [X.T.] loses focus easily, and he needs to be redirected or prompted multiple times in a class period." *Id.*

As for attending and completing tasks, Ms. Pruitt indicated X.T. has (1) no problem sustaining attention during play/sports activities, waiting to take turns, and changing from one activity to another without being disruptive; (2) on a weekly basis a slight problem paying attention when spoken to directly, carrying out single-step instructions, and organizing own things or school materials; (3) on a weekly basis an obvious problem working at a reasonable pace/finishing on time, working without distracting self or others, completing work accurately without careless mistakes, completing class/homework assignments, and carrying out multi-step instructions; (4) on a daily basis an obvious problem refocusing to task when necessary; (4) on a daily basis a serious problem focusing long enough to finish an assigned activity or task. R. 293. Ms. Pruitt did

not indicate X.T. has a very serious problem in any areas within the domain of attending and completing tasks. *Id*. Ms. Pruitt noted X.T. "needs several prompts to remain on task." *Id*.

As for interacting and relating with others, Ms. Pruitt indicated X.T. has (1) no problem playing cooperatively with other children, seeking attention appropriately, expressing anger appropriately, asking permission appropriately, following rules (classroom, games, sports), respecting/obeying adults in authority, relating experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, taking turns in conversation, interpreting meaning of facial expression, body language, hints, and sarcasm, and using adequate vocabulary and grammar to express thoughts/ideas in general, every day conversation, and (2) on a daily basis a slight problem making and keeping friends. R. 294. Ms. Pruitt noted that "[X.T.] is a very respectful young man." *Id*.

As for caring for himself, Ms. Pruitt indicated that X.T. has no problem handling frustration appropriately, being patient when necessary, taking care of personal hygiene, caring for physical needs (e.g., dressing, eating), using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, responding appropriately to changes in own mood (e.g., calming self), and using appropriate coping skills to meet daily demands of school environment. R. 296. Mr. Pruitt also indicated that, on a weekly basis, X.T. has an obvious problem knowing when to ask for help stating that X.T. "does not ask for help when he should." *Id*.

Jessica Slough, X.T.'s eighth grade Health/Physical Education teacher at Benjamin Franklin Middle School, reported that she knew X.T. approximately four months and saw him "every day for 86 minutes" at the time of completing the teacher questionnaire.[4] R. 299. Ms.

---

[4] The undersigned assumes Ms. Slough saw X.T. Monday through Friday during X.T.'s Health and Physical Education class when school was in session.

Slough indicated that X.T. was below grade level regarding his reading level and written language level. *Id*. Ms. Slough noted that X.T. has problems acquiring and using information, attending and completing tasks, and caring for himself, and no problems interacting and relating with others and moving about and manipulating objects. R. 300–07. Ms. Slough reported she did not know if X.T. was prescribed medication. R. 306.

As for acquiring and using information, Ms. Slough indicated that X.T. has an obvious problem comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, learning new material, recalling and applying previously learned material, and applying problem solving skills in class discussions. R. 300. Ms. Slough also indicated that X.T. has a serious problem expressing ideas in written form. *Id*. Ms. Slough noted that [X.T.] was not confident in sharing during class and was mainly distracted by friends/girlfriends." *Id*.

As for attending and completing tasks, Ms. Slough noted X.T. has (1) no problem sustaining attention during play/sports activities, waiting to take turns, and changing from one activity to another without being disruptive; (2) on a daily basis a slight problem paying attention when spoken to directly, refocusing to task when necessary, carrying out single-step instructions, organizing own things or school materials, and working without distracting himself or others; (3) on a daily basis an obvious problem focusing long enough to finish an assigned activity or task, carrying out multi-step instructions, and completing work accurately without careless mistakes; and (4) on a daily basis a serious problem completing class/homework assignments and working at reasonable pace/finishing on time. R. 302. Ms. Slough also indicated that "[i]n order for [X.T.]

to complete health assignments – [she] had to stand over him and help. If [she] walked away he would quickly get off task. He did very well in the gym." *Id*.

Ms. Slough reported X.T. has no problems moving about and manipulating objects. R. 304. She also noted that "[X.T.] was great in P.E.! He never used his prosthetic as an excuse and out hustled the other students. Sometimes he had trouble staying under control because he was going so fast!" *Id*.

As for caring for himself, Ms. Slough reported X.T. has (1) no problem being patient when necessary, taking care of personal hygiene, cooperating in, or being responsible for, taking needed medications, using good judgment regarding personal safety and dangerous circumstances, and identifying and appropriately asserting emotional needs; (2) on a daily basis a slight problem handling frustration appropriately, responding appropriately to changes in his mood (e.g., calming himself), using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help; and (3) on a daily basis a very serious problem caring for physical needs, highlighting that the issue is eating. R. 305. Ms. Slough also reported that "[a]fter our nutrition unit [X.T.] stopped eating. His grandmother expressed her concern about this. I tried to explain to him that he needed to eat healthy but not eating at all was unhealthy. He also got upset when he and his girlfriend broke up." *Id*.

Tampra Scales, X.T.'s Pre-Algebra teacher at Benjamin Franklin Middle School, reported that she knew X.T. for about seven months and saw him 90 minutes, 5 days a week at the time she filled out the teacher questionnaire. R. 308. Ms. Scales indicated that X.T. was performing below average in math. R. 291. Ms. Scales noted that X.T. had no limitations interacting and relating with others and moving about and manipulating objects, but had problems acquiring and using

information, attending and completing tasks, and caring for himself. R. 308–15. Ms. Scales did not address the section about whether X.T. was prescribed medication. R. 314.

As for acquiring and using information, Ms. Scales reported X.T. has (1) a slight problem comprehending oral instructions, understanding school and content vocabulary, and understanding and participating in class discussions; (2) an obvious problem comprehending and doing math problems; (3) a serious problem learning new material and recalling and applying previously learned material, and (4) a very serious problem reading and comprehending written material, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and applying problem-solving skills in class discussions. R. 309. Ms. Scales noted X.T. "receives extra help during class," "prompting," "one-to-one," and "gets tutoring." *Id*.

As for attending and completing tasks, Ms. Scales reported X.T. has (1) no problem sustaining attention during play/sports activities, carrying out single-step instructions, waiting to take turns, and changing from one activity to another without being disruptive; (2) a serious problem refocusing to task when necessary (daily), carrying out multi-step instructions (daily), and completing class/homework assignments (weekly); and (3) a very serious problem paying attention when spoken to directly, focusing long enough to finish assigned activity or task (daily and weekly), organizing his own things or school materials (daily), completing work accurately without careless mistakes (daily), working without distracting self or others (daily), and working at a reasonable pace/finishing on time (daily). R. 310. Ms. Scales noted X.T. has "difficulty working independently," "needs prompting and redirect[ing]," and "often needs reteaching." *Id*.

As for caring for himself, Ms. Scales reported X.T. has (1) no problem taking care of hygiene, caring for physical needs (e.g., dressing, eating), and cooperating in, or being responsible for, taking needed medications; (2) a slight problem using good judgment regarding personal

safety and dangerous circumstances (monthly), responding appropriately to changes in his mood (e.g., calming himself) (weekly), using appropriate coping skills to meet daily demands of the school environment (daily), and knowing when to ask for help (daily); and (3) on a daily basis an obvious problem handling frustration appropriately and being patient when necessary. R. 313. Ms. Scales noted X.T. asks for frequent restroom breaks, needs to move around the room/area, and sometimes struggles with staying in his seat or assigned work area. *Id*.

On September 8, 2020, Ms. Pruitt and Ms. Scales completed a combined Teacher Questionnaire. R. 266–73. They reported they saw X.T. every day, Monday through Friday, for school. R. 266. They also reported X.T.'s reading, math, and written language levels improved since their prior questionnaires noting they were at his current (eighth) grade level. *Id*. They reported X.T. has no problem moving about and manipulating objects, but has problems acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. R. 266–73. They reported they did not know if X.T. was prescribed medication. R. 272.

As for acquiring and using information, they reported X.T. has (1) no problem understanding and participating in class discussions and providing organized oral explanations and adequate descriptions; (2) a slight problem understanding school and content vocabulary; (3) an obvious problem comprehending oral instructions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions; (4) a serious problem reading and comprehending written material and comprehending and doing math problems; and (5) a very serious problem expressing ideas in written form. R. 267.

As for attending and completing tasks, they reported X.T. has (1) no problem carrying out single-step instructions, waiting to take turns, and changing from one activity to another without

being disruptive; (2) on a daily basis a slight problem organizing his own things or school materials; (3) on a daily basis an obvious problem paying attention when spoken to directly and carrying out multi-step instructions; (4) on a daily basis a serious problem completing work accurately without careless mistakes and working without distracting himself or others; and (5) on a daily basis a very serious problem focusing long enough to finish an assigned activity or task, refocusing to task when necessary, completing class/homework assignments, and working at a reasonable pace/finishing on time. R. 268.

As for interacting and relating with others, they reported X.T. has (1) no problem playing cooperatively with other children, expressing anger appropriately, asking permission appropriately, respecting/obeying adults in authority, using language appropriate to the situation and listener, taking turns in conversation, and interpreting the meaning of facial expression, body language, hints, or sarcasm; (2) on a daily basis a slight problem making and keeping friends, following rules (classroom, games, sports), relating experiences and telling stories, and introducing and maintaining relevant and appropriate topics of conversation; (3) on a daily basis an obvious problem using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation (highlighting issues with grammar); and (4) on a daily basis a serious problem seeking attention appropriately. R. 269.

As for caring for himself, they reported X.T. has (1) no problem being patient when necessary, taking care of personal hygiene, caring for physical needs (e.g., dressing, eating), using good judgment regarding personal safety and dangerous circumstances, and identifying and appropriately asserting emotional needs; (2) on a daily basis a slight problem handling frustration appropriately, responding appropriately to changes in his own mood (e.g., calming self), and using

appropriate coping skills to meet daily demands of the school environment; and (3) on a daily basis an obvious problem knowing when to ask for help.

In November 2021, X.T.'s tenth grade teachers in Biology and Algebra completed Teacher Questionnaires. R. 328–43.

Austin Gray, X.T.'s tenth grade Biology teacher at Franklin County High School, reported he knew X.T. for three months and saw him 90 minutes per day, Monday through Friday, when he filled out the teacher questionnaire. R. 328. Mr. Gray reported X.T. received small group/extended time through special education services. *Id*. Mr. Gray reported X.T. has no limitations acquiring and using information, moving about and manipulating objects, and caring for himself, but has limitations attending and completing tasks and interacting and relating with others. R. 328–335 Mr. Gray responded he did not know if X.T. was prescribed medication. R. 334.

As for attending and completing tasks, Mr. Gray reported X.T. on a weekly basis has (1) no problem sustaining attention during play/sports activities, carrying out single-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing his own things or school materials, completing work accurately without careless mistakes, working without distracting himself or others, and working at a reasonable pace/finishing on time; (2) a slight problem refocusing to task when necessary, carrying out multi-step instructions, and completing class/homework assignments; (3) an obvious problem paying attention when spoken to directly; and (4) a serious problem focusing long enough to finish assigned activity or task. R. 330.

As for interacting and relating with others, Mr. Gray reported X.T. on a daily basis has (1) no problem making and keeping friends, seeking attention appropriately, expressing anger appropriately, asking permission appropriately, respecting/obeying adults in authority, relating

experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, taking turns in conversation, interpreting meaning of facial expression, body language, hints, and sarcasm, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation; (2) an obvious problem following rules (classroom, games, sports); and (3) a serious problem playing cooperatively with other children. R. 331.

Susan Fetter, X.T.'s tenth grade Algebra teacher at Franklin County High School, reported he knew X.T. for three months and saw him 90 minutes per day when she filled out the teacher questionnaire. R. 336. Ms. Fetter did not address X.T.'s math level. *Id.* Ms. Fetter reported X.T. has no limitations acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself, but has limitations moving about and manipulating objects. R. 336–43. Ms. Fetter responded she did not know if X.T. is prescribed medication. R. 342. As for moving about and manipulating objects, Ms. Fetter reported X.T. has an obvious problem moving body weight from one place to another (e.g., standing, balancing, shifting weight, bending, kneeling, crouching, walking, running, jumping, climbing), moving and manipulating things (e.g., pushing, pulling, lifting, carrying, transferring objects, coordinating eyes and hands to manipulate small objects), and managing pace of physical activities or tasks. R. 340.

In December 2021, Gary Fitzgerald, X.T.'s tenth grade Electricity 2 teacher at Franklin County High School, completed a Teacher Questionnaire. R. 346–53. Mr. Fitzgerald reported he knew X.T. for three to four months, Monday through Friday, when he filled out the teacher questionnaire. R. 346. Mr. Fitzgerald reported he did not know if X.T. was prescribed medication. R. 352. Mr. Fitzgerald reported X.T. had no limitations regarding acquiring and using information,

attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. R. 346–53.

### D.  State Agency Medical and Psychological Consultants

In September 2020, Richard Surrusco, M.D., and Howard Leizer, Ph.D., reviewed the record at the initial level and found that X.T. did not have an impairment that met, medically equaled, or functionally equaled the listings. R. 110. They concluded that X.T. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being, and no limitations in the domains of moving about and manipulating objects and caring for himself. R. 110–11.

In March 2021, Joseph Duckwall, M.D., and Leslie Montgomery, Ph.D., reviewed the record at the reconsideration level and similarly found X.T. did not have an impairment that met, medically equaled, or functionally equaled the listings. R. 118. They concluded that X.T. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and health and physical well-being, and no limitations in the domain of caring for himself. R. 118–19.

### E.  Testimony

Lillie and X.T. both appeared and testified at the December 9, 2021, telephonic hearing before the ALJ. R. 30. X.T. testified that he had "a little bit" of difficulty with keeping up with classwork and class assignments and that he received additional time on tests. R. 44. He believed he had a "D" in math, a "C" or "D" in biology, and an "A" in electricity. *Id*. When questioned if he was having trouble sleeping, he testified that he was getting a decent amount of sleep. *Id*. As for chores around the house, X.T. testified that his grandmother sometimes had to remind him to do chores and that it takes him awhile to finish them. R. 45.

As for his prosthesis, X.T. testified that the pain and swelling stopped, but if he hits his knee it hurts, but "not that much." *Id*. He claimed his most recent prosthesis did not fit well and that he had to put a sock in it, but he could get around okay. *Id*. He otherwise had no issues or problems with his prosthesis. *Id*. He denied having any issues interacting with others at school stating he made "20 best friends" this year. R. 46.

Lillie testified that X.T. takes his prosthesis off when he comes home from school because it irritates him. R. 47, 54–55. She explained that he lays in bed Friday until Monday morning which his doctor claims he needs to stop because he has scoliosis. R. 47. She explained that X.T loved playing soccer and was depressed that the season was over stating that soccer is the only thing X.T. feels like he can do. R. 48. When in his room, Lillie stated X.T. watches YouTube videos or Japanese movies, sleeps, or plays videogames. R. 49.

As for X.T.'s grades, Lillie testified X.T. got an "F" in math, a "D" in biology, and an "A" or "B" in electricity during his first semester. *Id*. She explained that X.T.'s math teacher moved him to the front of the classroom to help him focus and had X.T. stay after school on two occasions for tutoring sessions. R. 49–50. Lillie testified that X.T. had two "A's" and a "B" at the beginning of the first semester, but his grades eventually dropped, other than electricity which is X.T.'s favorite subject. R. 50. She further testified that X.T. did not always complete his assignments or his homework. R. 50–51, 55–56. She claimed she did not talk to X.T.'s electricity teacher because he does well in that class, but his math and biology teachers told her he has trouble focusing in their classes. R. 51. As for chores and self-care, Lillie testified she has to prompt X.T. to take a bath, put on deodorant, get out of bed and ready for school in the morning, and clean his room. R. 51–52, 57.

As for X.T.'s eczema, Lillie testified that it is controlled with his cream. R. 53. As for his

ADHD, X.T. is prescribed medication but X.T. does not like to take it because it effects his

appetite. *Id*. Lillie testified that she believes X.T.'s leg bothers him because he immediately takes

off his prosthetic when he comes home, but he has not verbalized this issue to her. R. 54–55.

## ANALYSIS

Lillie challenges the ALJ's determination that X.T. has less than marked limitation in

Domain I, acquiring and using information, and Domain II, attending and completing tasks. ECF

No. 18 at 19–26. Lillie further alleges the ALJ's assessment of the allegations of Lillie and X.T.

are not supported by substantial evidence. *Id*. at 27–28.

**I.    Substantial evidence supports the finding that X.T. had less than a marked limitation in Domain I, acquiring and using information, and Domain II, attending and completing tasks.**

Lillie argues that the ALJ erred in his determination that X.T. has less than marked

limitation in Domain I, acquiring and using information, and Domain II, attending and completing

tasks. ECF No. 18 at 19–26. Lillie first alleges, without legal support, that the ALJ erred in

collectively considering the domains of acquiring and using information and attending and

completing tasks. As stated by the Commissioner, there is no set standard or formula for

considering and assessing the domains of functioning. SSR 09-1p, 2009 WL 396031, at *7

(S.S.A.). Additionally, these two domains may overlap so it follows that the ALJ would consider

them in tandem. *See* SSR 09-3p, 2009 WL396025, at *4 (S.S.A.) ("[M]ental impairments that

affect a child's ability to learn may also affect a child's ability to attend or to complete tasks. In

such cases, we evaluate limitations in both the domains of 'Acquiring and using information' and

'Attending and completing tasks.'"). Accordingly, the undersigned finds Lillie's argument on this point to be without merit.[5]

In support of her argument regarding X.T.'s limitations in acquiring and using information and attending and completing tasks, Lillie mainly restates favorable evidence in the record, but also alleges that (1) the ALJ's assessment of the evidence is "cursory" and not supported by substantial evidence, (2) the ALJ attempts to minimize significant evidence to support his findings and conclusions, and (3) the ALJ's assertion that the teacher questionnaires are all inconsistent with each other and they show that ADHD medication improved X.T.'s limitations between the time the questionnaires were completed is an inaccurate assertion. ECF No. 18 at 19–26.[6] In consideration of Lillie's and the Commissioner's arguments, the undersigned finds there is substantial evidence to support the ALJ's decision.

The ALJ clearly considered the entire record and, through his analysis, explained his perceived reasons for the discrepancies between the teacher questionnaires. R. 20. Unlike Lillie's argument that the ALJ mischaracterized evidence regarding the school records and questionnaires, it is evident, as noted by the ALJ, that X.T.'s teachers had differing opinions regarding X.T.'s limitations in acquiring and using information and attending and completing tasks.

When reviewing the domain of acquiring and using information, the ALJ is to consider how well the child acquires or learns information, and how well the child uses the information he has learned. 20 C.F.R. § 416.926a(g).

---

[5] Counsel for Lillie admits during the hearing before the ALJ that the domains overlap. *See* R. 43 ("[Y]ou know the interesting part of these functional limitations is they all kind of bleed over . . . and can carry over into other limitations.").

[6] Although Lillie addresses the limitations separately in her brief, she makes the exact same arguments regarding the ALJ's alleged errors regarding his analysis of Domain I and Domain II. Thus, the undersigned will consider these domains collectively.

In reviewing Domain I, acquiring and using information, the ALJ noted that in February 2020, X.T.'s eighth grade teachers reported X.T.'s abilities were below average grade level, and his biggest weakness was writing, as well as problem-solving and providing oral explanations. R. 20. However, in September 2020, his teachers reported that X.T.'s reading, math, and writing abilities were within an eighth-grade level, which shows improvement from the previous questionnaires. *Id*.  Importantly, in November 2021, X.T.'s tenth grade teachers reported no problems in the domain of acquiring and using information. *Id*. The ALJ did not dismiss X.T.'s poor grades, he explicitly acknowledged X.T. had "poor grades in multiple subjects," but noted that he also had better grades, including "A's." *Id*. The ALJ also considered X.T.'s extracurricular activities, specifically that he enjoyed playing soccer and video games, which is relevant to this domain. *See* SSR 09-3p, 2009 WL 396025, at *2.

When reviewing the domain of attending and completing tasks, the ALJ is to consider how well the child focuses and maintains attention and how well he begins, carries through, and finishes activities or tasks. 20 C.F.R. § 416.926a(h). As for Domain II, attending and completing tasks, the ALJ specifically noted that X.T.'s teachers in February 2020 reported he had serious or very serious problems in attending and completing tasks, stating he lacked focus. R. 20. However, the ALJ contrasted these opinions with other relevant evidence, specifically that X.T.'s Section 504 plan did not provide "great" accommodations in this area, and that even with focus issues, his teachers reported in September 2020 that his reading, math, and writing abilities were at his current (8th grade at the time) level. R. 20. Importantly, as considered by the ALJ, in November 2021, X.T.'s tenth grade algebra and electricity teachers reported no limitations in attending and completing tasks. *Id*.

The ALJ specifically considered that X.T. received accommodations at school for his ADHD through a 504 plan, which entails additional time to complete tests as well as small group study, contrary to Lillie's argument that the ALJ ignored this evidence. *Id*. Importantly, the ALJ considered the medical evidence which shows that X.T.'s performance and focus appeared to improve with medication, specifically when ADHD medication was added to his daily regimen. *Id*. The ALJ considered the timeline of his medication, along with the noted limitations in the teacher questionnaires, and reached the rational conclusion that X.T.'s focus and limitations improved once taking his medication. *Id*.

The ALJ also considered the state agency determinations regarding X.T.'s limitations finding the opinions persuasive. Specifically, the state agency consultants found X.T. had less than marked limitations in both domains. R. 110, 118.

Lillie claims the ALJ ignored evidence or minimized evidence to support his conclusions, but that is simply not the case. The ALJ summarizes in detail the medical evidence and school records relevant to X.T.'s limitations in Domains I and II. Although Lillie believes a different conclusion is warranted based upon the evidence in the record, as long as the ALJ applied the correct legal standard and engaged in an analysis providing the undersigned with the necessary "logical bridge" between the evidence and the ALJ's conclusion, I must defer to the ALJ's decision. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).[7] Accordingly, there is substantial evidence to affirm the ALJ's decision regarding his conclusion that X.T. has less than

---

[7] Lillie also argues that the ALJ failed to compare X.T. to unimpaired peers and assess his limitations compared to peers who do not suffer from the same limitations. ECF No. 18 at 22, 26. The ALJ's thorough analysis of each of the six domains satisfies this comparison analysis. Further, the feedback provided by X.T.'s teachers in their questionnaires, and specifically considered by the ALJ, is information about X.T.'s limitations in comparison to the functioning of same-aged children without impairments. *See* R. 261–315, 328–43, 346–53.

marked limitations in the domains of acquiring and using information and attending and completing tasks.

## II.   Substantial evidence supports the ALJ's assessment of Lillie's and X.T.'s allegations.

Lillie argues that the ALJ erred in his assessment of X.T. and Lillie's allegations as he failed to explain how he evaluated their allegations or how he arrived at his decision that their allegations are inconsistent with the evidence in the record and failed to make specific findings regarding Lillie's credibility. ECF No. 18 at 27–28. The Commissioner claims there is no merit to Lillie's argument as the ALJ's assessment of Lillie and X.T.'s allegations is supported by substantial evidence. ECF No. 25 at 19–21.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. *See* 20 C.F.R. § 416.929(b)-(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms. *Id*. § 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the child's functioning. *Id*. § 416.929(c). When evaluating the intensity and persistence of a child's symptoms, the ALJ will consider all of the evidence presented, including evidence submitted by a child's medical sources (such as physicians, psychologists, and therapists) and nonmedical sources (such as educational agencies and personnel, parents and other relatives, and social welfare agencies). 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

Here, the ALJ determined that X.T.'s medically determinable impairments could reasonably expect to cause the alleged symptoms, but that Lillie's and X.T.'s statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely

consistent with the medical evidence and other evidence in the record. R. 20. In his decision, the ALJ summarized the allegations made by Lillie regarding X.T.'s functioning, and also outlined X.T.'s testimony regarding his symptoms and limitations at the December 9, 2021, hearing. R. 16. The ALJ then went on to review the medical and educational records in depth to explain how the record does not support the intensity, persistent, and limiting effect of X.T.'s symptoms and Lillie's and X.T.'s allegations. R. 20–22.

Lillie specifically contends that her allegations, as well as X.T.'s allegations, about difficulty concentrating and staying on task were supported by the medical evidence and school records. ECF No. 18 at 28. However, as discussed in Section I *supra*, the ALJ did not dispute that X.T. had some limitations in these areas, but not to the severity to be considered "marked." The ALJ reached the rational conclusion, in considering the medical and school records, that X.T.'s functioning, including his ability to focus and stay on task, improved once he took his ADHD medication. R. 20.

In sum, the ALJ considered Lillie's and X.T.'s allegations regarding his symptoms and crafted an evidence-based assessment of his abilities and limitations through review of the other evidence in the record. A reviewing court gives great weight to the ALJ's assessment of a claimant's statements and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Accordingly, I conclude that the ALJ supported his analysis of Lillie's and X.T.'s allegations with substantial evidence.

## <u>CONCLUSION</u>

For the above reasons, I recommend the presiding District Judge **DENY** Lillie's Motion for Summary Judgment, ECF No. 17; **GRANT** the Commissioner's Motion for Summary

Judgment, ECF No. 24; **AFFIRM** the Commissioner's final decision denying SSI benefits and

**DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is

directed to transmit the record in this matter to the Honorable Robert S. Ballou, United States

District Judge.

The Clerk shall serve copies of this Report and Recommendation on all counsel of record

and any unrepresented parties.

Entered:  March 5, 2024

C. Kailani Memmer
United States Magistrate Judge